UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PS LIT RECOVERY, LLC | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action |
| | ) No. 24-12996-WGY |
| PEGASYSTEMS INC., | ) |
| ALAN TREFLER, | ) |
| and KENNETH STILLWELL | ) |
| | ) |
| | ) |
| Defendants. | ) |

YOUNG, D.J.                                January 8, 2026

**MEMORANDUM & ORDER**

## I.  INTRODUCTION

This action was brought by PS Lit Recovery, LLC ("PS Lit")
--an assignee of claims from Pegasystems Inc. ("Pega") common
stock purchasers that were advised by Praesidium Investment
Management Company, LLC, Compl., ECF No. 1, ¶ 33, on the heels
of the class action case City of Fort Lauderdale Police &
Firefighters' Retirement Systems v. Pegasystems Inc., 683 F.
Supp. 3d 120 (D. Mass. 2023) ("Fort Lauderdale").  Fort
Lauderdale was decided against the backdrop of the Virginia
Circuit Court decision in Appian Corp. v. Pegasystems Inc.,
Civil Action No. 2020-07216 (Circuit Court of Fairfax County,
Virginia) (the "Virginia Action"), ordering Pega to pay Appian
Corporation ("Appian") over $2,000,000,000 for willfully and

maliciously misappropriating Appian's trade secrets.    That
judgment had since been reversed and remanded by the Virginia
Court of Appeals in Pegasystems Inc. v. Appian Corp., 904 S.E.2d
247, 284 (2024), appeal granted (Mar. 7, 2025) (hereinafter
"Virginia Court of Appeals decision")).    The defendants in this
case: Pega, Alan Trefler ("Trefler"), and Kenneth Stillwell
("Stillwell") (Trefler and Stillwell jointly referred to as "the
Individual Defendants") contend that this development undermines
the conclusions made by this Court in Fort Lauderdale, which led
to the denial of Pega's motion to dismiss (except, with respect
to defendant Stillwell, the motion to dismiss was granted
without prejudice).    Fort Lauderdale, 683 F. Supp. 3d at 125.
This Court has accordingly agreed to look afresh at the
allegations made by PS Lit in this case.

    For the reasons stated below, defendants Pega, Trefler and
Stillwell's Motion to Dismiss the Complaint ("Defs.' Mot.
Dismiss"), ECF No. 26, is hereby **DENIED in part** and **ALLOWED in
part.**

## II.  PROCEDURAL HISTORY

    PS Lit filed this lawsuit against Pega, Trefler and
Stillwell on December 4, 2024, following the class settlement
opt-out period in Fort Lauderdale, 683 F. Supp. 3d 120.    The
complaint here alleges the same two counts as the class action

[2]

in <u>Fort Lauderdale</u>: violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 (count I), and violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) (count III).  In addition, PS Lit alleges scheme liability under Rule 10b-5 (a) and (c) (count II), common law fraud (count IV), and common law negligent misrepresentation (count V).  <u>See</u> Compl.

On March 13, 2025, the Defendants filed a motion to dismiss all five counts of the complaint.  Defs.' Mot. Dismiss, ECF No. 26.  The parties have fully briefed the issues.  Defs.' Mem. Supp. Mot. Dismiss ("Defs.' Mem."), ECF No. 27; PS Lit Recovery's Opp'n Defs.' Mot. Dismiss ("Pl.'s Opp'n"), ECF No. 31; Defs.' Reply Br. Supp. Mot. Dismiss Compl. ("Defs.' Reply"), ECF No. 37.

This Court held a hearing on the Defendants' motion to dismiss on July 22, 2025.  Elec. Clerk's Notes, ECF No. 40. After hearing arguments of counsel, the Court **DENIED** the motion as to improper assignment and **ALLOWED** the motion as to count II (Rule 10b-5(a) and (c) scheme).  The Court also ruled the allegations with respect to Stillwell are still insufficient, but are adequate as to count III (Section 20(a)).  The Court took the remainder under advisement.  <u>See</u> <u>id.</u>

## III. Facts Alleged

The allegations brought here by PS Lit mirror, but also expand on, the same set of operative facts as in Fort Lauderdale, 683 F. Supp. 3d at 126-128.

Pega, founded in 1983, offers a "low code" software application development platform that allows customers to build and tailor applications as per their specific business needs. Compl. ¶¶ 43-44. The defendant Trefler is, and has been, Pega's CEO and Chairman of the Board of Directors since the company's founding. Id. ¶ 40. The defendant Stillwell joined Pega in July 2016 as Senior Vice President, Chief Financial Officer ("CFO"), and Chief Administrative Officer ("CAO") and was promoted to Chief Operating Officer ("COO") in April 2021. Id. ¶ 41. One of Pega's main competitors on the business process management ("BPM") market is Appian. Id. ¶ 45.

Beginning 2012, Pega engaged in a series of corporate intelligence activities, allegedly with intent to misappropriate Appian's trade secrets. Id. ¶ 6. These activities can be broken down into two distinct phases: 1) "Project Crush" (2012-2014), and 2) "Teardown" (2019-2022). Id. ¶¶ 6, 8, 11, 53, 63.

### A.  "Project Crush"

Early in 2012, Pega hired Youyong Zou ("Zou") to conduct a series of actions, codenamed "Project Crush", pertaining to Appian software, which allegedly included "(i) creat[ing] videos

[4]

of himself accessing Appian's platform; (ii) covertly download[ing] ... Appian's software documentation for Pega; (iii) showcas[ing] for Pega the functionality of Appian's platform; (iv) suppl[ying] Pega with confidential information regarding the strengths and limitations of Appian's software; (v) demonstrat[ing] to Pega how to use and navigate Appian's platform; and (vi) answer[ing] Pega's detailed technical questions about Appian's platform." Id. ¶ 53.

Based on the allegations, Pega was aware of the illicit nature of these activities and attempted to conceal them: Zou was hired through a third party – KForce - that also paid Zou, id. ¶¶ 6-7, 51-52, 251; and he was internally referred to as "Matt" to hide his identity. Id. ¶ 64.

Personnel involved in "Project Crush" included CEO Alan Trefler; Pega's Chief Product Officer ("CPO") Kerim Akgonul ("Akgonul"); Chief Technology Officer ("CTO") Don Schuerman ("Schuerman"); Chief of Clients and Markets ("CMM") Leon Trefler (defendant Trefler's brother); Director of Product Marketing John Petronio ("Petronio"); Director of the Office of the CTO Ben Baril ("Baril"); Head of Product Marketing Douglas Kim ("Kim"); and Vice President of Product Management Steve Bixby ("Bixby"). Id. ¶¶ 10, 49, 65, 71, 76.

**B.   "Teardown"**

In 2019, Pega initiated an operation "'similar' to 'Project Crush,' but 'broader [in] scope'".  Id. ¶ 77 (internal citation omitted).  Unable to find a suitable contractor, Pega decided to act on its own by accessing the Appian software through free trial licenses and record reference materials.  Id. ¶¶ 80-83. These licenses were obtained through, among other things, using fake names, front and fake companies, id. ¶¶ 91-109, or businesses of Pega employees' significant others, id. ¶ 84. Pega's senior executives and officers were aware of these actions, id. ¶ 79; facts alleged by PS Lit further indicate awareness of the illicit character of this operation, id. ¶¶ 83-85, 89.

**C.   The Virginia Action**

On May 29, 2020, Appian filed a lawsuit against Pega, alleging Pega's engagement in "unlawful schemes . . . [that] involved stealing Appian's trade secrets and confidential information and then using them to damage Appian's business and reputation, and to steal Appian's customers and potential customers" which "[i]nvolv[ed] personnel at Pegasystems up to and including Pegasystems' CEO and Founder, Alan Trefler, and other high-ranking Pegasystems executives." Id. ¶¶ 13-14 (emphasis omitted).  Appian initially claimed it "suffered and will suffer substantial monetary damages in an amount that will

[6]

exceed $90 million", id. ¶ 192 (emphasis omitted); it eventually amended its complaint on February 11, 2022, seeking approximately $3 billion. Id. ¶¶ 162, 197.

In response to that development, Pega -- in its Report on Form 10-K filed on February 16, 2022 -- for the first time made an express and detailed mention of the Virginia Action.[1] Id. ¶¶ 20, 263. In the same report, Pega stated that: Appian's claims, "are without merit," Pega has "strong defenses to these claims," and "any alleged damages claimed by Appian are not supported by the necessary legal standard." Id. ¶ 125 (emphasis omitted). On May 9, 2022, the jury returned a unanimous verdict in favor of Appian, finding that Pega willfully and maliciously misappropriated Appian's trade secrets in violation of the Virginia Uniform Trade Secrets Act ("VUTSA") and a violation of Virginia Computer Crimes Act ("VCCA") provisions, and awarded Appian $2,036,860,045 in damages (before interest and attorney's fees). Id. ¶¶ 127-28.

Pega appealed and the Virginia Court of Appeals held that, while Pega was not entitled to judgement as matter of law, the trial court "committed a series of errors" that warranted a

---

[1] 10-Q and 10-K forms filed by Pega between May 29, 2020, and February 16, 2022, contained a statement that "[Pega] ha[s] received, and may in the future receive, notices that claim [Pega] ha[s] misappropriated, misused, or infringed other parties' intellectual property rights. . . ." Compl., ¶ 153.

reversal of the judgement as to the VUTSA claims and a remand for a new trial. Pegasystems Inc., 904 S.E.2d at 284; Compl., ¶¶ 132-134. The Virginia Supreme Court has since agreed to hear the petition seeking to reinstate the verdict. Pl.'s Opp'n, ECF No. 31, at 7; Appian Corp. v. Pegasystems, Inc., No. 240736, 2025 Va. LEXIS 12, at *1 (Mar. 7, 2025).

In response to Pega's February 16, 2022 disclosure of the Virginia Action, Pega's stock price dropped approximately 15.62% on February 17, 2022. Pega's stock price gradually diminished in value between the commencement of the Virginia Action trial (March 21, 2022) and again the day before the verdict was announced (May 9, 2022) from $79.57 to $65.93. It dropped by approximately 20% on the day the verdict was announced (May 10, 2022), and another 8% the day after. Compl., ¶¶ 263-266.

## IV. ANALYSIS

### A. Pleading Standard

To withstand a motion to dismiss, PS Lit's complaint must "state a claim upon which relief can be granted ....", Fed. R. Civ. P. 12(b)(6), meaning, it must include sufficient factual allegations that, accepted as true, "state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). The Court must "accept well-pleaded factual allegations in [PS Lit's Compl.] as true and view all reasonable inferences in [its] favor." Premca Extra Income Fund

LP v. iRobot Corp., 763 F. Supp. 3d 121, 146 (D. Mass. 2025)
(quoting Zhou v. Desktop Metal, Inc., 120 F. 4th 278, 287 (1st
Cir. Oct. 28, 2024)).  Thus, under this standard, the Court
"draw[s] every reasonable inference" in favor of the plaintiff,
Berezin v. Regency Sav. Bank, 234 F.3d 68, 70 (1st Cir. 2000),
but disregards statements that "merely offer legal conclusions
couched as fact or threadbare recitals of the elements of a
cause of action," Ocasio-Hernández v. Fortuño-Burset, 640 F.3d
1, 12 (1st Cir. 2011) (brackets, ellipsis, and quotations
omitted).

　　"To state a claim under section 10(b), a complaint must
allege: '(1) a material misrepresentation or omission; (2)
scienter; (3) a connection with the purchase or sale of a
security; (4) reliance; (5) economic loss; and (6) loss
causation.'" Quinones v. Frequency Therapeutics, Inc., 106 F.
4th 177, 182 (1st Cir. 2024) (quoting In re Biogen Inc. Sec.
Litig., 857 F.3d 34, 41 (1st Cir. 2017)).  Finally, because PS
Lit brought securities as well as state fraud claims, the
allegations in the complaint must meet the standard under
Federal Rule of Civil Procedure 9(b) and the "heightened
pleading requirements" imposed on private securities litigation.
Mississippi Pub. Employees' Ret. Sys. v. Boston Scientific
Corp., 523 F.3d 75, 85 (1st Cir. 2008).  Under Rule 9(b), PS Lit

is required to plead with particularity the circumstances
[constituting] fraud.  Zhou, 120 F.4th at 287.

The sufficiency of pleadings under Section 10(b) and Rule
10b-5(b) claims, mirroring the ones brought here by PS Lit, have
already been the subject of an analysis by this Court in Fort
Lauderdale.  Now, Pega challenges the conclusions made in Fort
Lauderdale -- which there led to a denial of a motion to dismiss
-- arguing that it was decided "on the heels" of a Virginia
state court's decision in Appian, which was since reversed and
remanded for a new trial by the Virginia Court of Appeals
decision.  See Defs.' Mem. at 1.

As this Court remarked during the motion hearing, it does
not give any weight to the legal determinations made by the
Virginia courts; the Virginia Court of Appeals decision,
however, by reversing and remanding the trial court's decision
that stood while this Court was deciding Fort Lauderdale, calls
for a renewed analysis of the sufficiency of the allegations
against the backdrop of the law is it now stands.  See Tr. Mot.
Hr'g, ECF No. 41 at 10, 17.

### B.  False and Misleading Statements

To survive a motion to dismiss, a securities complaint must
show that "defendants made a materially false or misleading
statement or omitted to state a material fact necessary to make
a statement not misleading."  Ganem v. InVivo Therapeutics

Holdings Corp., 845 F.3d 447, 454 (1st Cir. 2017) (quoting Geffon v. Micrion Corp., 249 F.3d 29, 34 (1st Cir. 2001)). The Private Securities Litigation Reform Act ("PSLRA") "mandates that the complaint must 'specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading.'" State Tchrs. Ret. Sys. of Ohio v. Charles River Lab'ys Int'l, Inc., 152 F.4th 1, 9 (1st Cir. 2025) (quoting 15 U.S.C. § 78u-4(b)(1)).

Under Rule 10b-5(b), it is unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading", in connection with the purchase or sale of a security. Zhou, 120 F.4th at 292 (quoting 17 C.F.R. § 240.10b-5(b)). "A fact or omission is material if 'a reasonable investor would have viewed it as having significantly altered the total mix of information made available.'" Id. (quoting Ponsa-Rabell v. Santander Sec. LLC, 35 F.4th 26, 33 (1st Cir. 2022)). "[W]hether a statement is 'misleading' depends on the perspective of a reasonable investor." Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, 575 U.S. 175, 186 (2015).

Rule 10b-5(b) does not, however, cover pure omissions -- only "half-truths." Macquarie Infrastructure Corp. v. Moab Partners, L. P., 144 S. Ct. 885, 891, (2024). The same applies

[11]

to Section 10(b). See Zhou, 120 F.4th at 292.  Thus, it "bears
emphasis that § 10(b) and Rule 10b-5(b) do not create an
affirmative duty to disclose any and all material information.
Disclosure is required under these provisions only when
necessary 'to make . . . statements made, in the light of the
circumstances under which they were made, not misleading.'"
Macquarie, 144 S. Ct. 885, 891 (2024) (quoting Matrixx
Initiatives, Inc. v. Siracusano, 563 U.S. 27, 44 (2011)).


### 1.   Materially Misleading Disclosures--Reassurances

PS Lit points to Pega's statements in its Report on Form
10-K for fiscal year 2021 (filed on February 16, 2022, and
signed by Trefler and Stillwell). In this 2021 report, Pega
stated "[it] believe[s]" that the claims asserted in the
Virginia Action were 'without merit,' Pega had 'strong defenses'
to the claims, and that the appropriate causation standard did
not support Appian's damages claim as false and/or misleading,
especially in light of "their years-long scheme to
misappropriate Appian's trade secrets." Compl. ¶¶ 21, 125, 163-
64.  Pega argues to the contrary that these statements "were
neither objectively nor subjectively false." Defs.' Mem. at 8.

This Court previously ruled these statements to be
actionable as they "did not 'fairly align' with [Trefler's]
awareness of, involvement in, and direction of Pega's espionage

[12]

campaign against Appian." <u>Fort Lauderdale,</u> 683 F. Supp. 3d at 135 (quoting <u>Omnicare</u>, 575 U.S. at 189). This Court further pointed out that "[g]iven the way that statement was couched and the identity of the speaker, a reasonable investor could justifiably have understood Trefler's message that Appian's claims were 'without merit' as a denial of the facts underlying Appian's claims -- as opposed to a mere statement that Pega had legal defenses against those claims." <u>Id.</u>

Now, Pega contends that the Virginia Court of Appeals decision "undermines any assertion that Defendants' opinions were objectively false" and "validates Defendants' subjective belief that Appian's claims were 'without merit', ... that Pega had 'strong defenses'", and that "the appropriate causation standard did not support Appian's damages claim." Defs.' Mem. at 9-10. The Court rejects this argument.

In general, securities law assumes an <u>ex ante</u> perspective of the statements made: "just as a statement true when made does not become fraudulent because things unexpectedly go wrong, so a statement materially false when made does not become acceptable because it happens to come true." <u>Pommer</u> v. <u>Medtest Corp.</u>, 961 F.2d 620, 623 (7th Cir. 1992). Such an approach is appropriate when dealing with statements of fact; less so when it involves to the "proper interpretation of data" where the analysis shifts towards the question whether such interpretation was rational or

reasonable.   In Re Philip Morris Int'l Inc. Sec. Litig., 89
F.4th 408, 422 (2d Cir. 2023) (quoting Tongue v. Sanofi, 816
F.3d 199, 214 (2d Cir. 2016)).   When it comes to opinions, "an
investor cannot state a claim by alleging only that an opinion
was wrong; the complaint must as well call into question the
issuer's basis for offering the opinion." Omnicare, 575 U.S. at
194.

> To be specific: The investor must identify particular
> (and material) facts going to the basis for the issuer's
> opinion--facts about the inquiry the issuer did or did
> not conduct or the knowledge it did or did not have--
> whose omission makes the opinion statement at issue
> misleading to a reasonable person reading the statement
> fairly and in context. . . . That is no small task for
> an investor.

Id.

As this Court emphasized in Fort Lauderdale, "[a]n issuer
may legitimately oppose a claim against it, even when it
possesses subjective knowledge that the facts underlying the
claims against it are true[,]" but "it must do so with
exceptional care, so as not to mislead investors." Fort
Lauderdale, 683 F. Supp. 3d at 135.   What it entails is that
"[a]n issuer may not . . . 'ma[ke] [(misleading)] substantive
declarations regarding its beliefs about the merits of the . . .
litigation.'"   Id. at 136 (quoting Rosenbaum Cap. LLC v. Boston
Commc'ns Grp., Inc., 445 F. Supp. 2d 170, 175 (D. Mass. 2006))
(alteration in original).   Thus, an issuer need be careful when

formulating such statements as "[a] reasonable investor 'expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time.'" Id. (quoting Omnicare, 575 U.S. at 189).

Pega, in its statements in the 2021 10-K expressed, in strong words, its "belie[f]" as to the lack of merit of Appian's claim in the Virginia Action, Pega's "strong defenses," and that "any alleged damages claimed by Appian are not supported by necessary legal standard of proximate cause." Compl. ¶ 162. By doing so, as this Court concluded in Fort Lauderdale, and what still holds true here, "Trefler and Pega categorically denied that Appian's claims had any merit -- despite possessing substantial information about the viability of those claims." 683 F. Supp. 3d at 136. While the reversal and remand of the Virginia Action verdict shifts the validity of the misappropriation claims alleged by Appian back to the realm of uncertainty, it does not dispel PS Lit's allegations as to Pega's extensive knowledge of the underlying facts and conduct -- hiring a "spy," accessing Appian's platform under "fake names," etc. Compl. ¶ 164. PS Lit points both to the opinions it believes were misleading or false, as well as the "particular (and material) facts going to the basis for the issuer's opinion," Omnicare, 575 U.S. at 194, while emphasizing a

resounding dissonance between them.  Pega does create a competing inference by undermining the relative and inherently subjective nature of "belief."  Defs.' Mem. at 8-10.  Pega does so, however, in light of the Virginia Court of Appeals decision which, of course, was also unavailable at the time Pega made the disputed statements.  In any case, such competing inferences should be resolved, as appropriate at this stage, for the non-movant.[2]  PS Lit's allegations that Trefler and Pega's opinion statements as to the Appian's claims were misleading are, therefore, adequately pled.  Fort Lauderdale, 683 F. Supp. 3d at 136.

Even if, however, this Court were to consider the conclusions made by the Virginia Court of Appeals, little changes.  A comparison invoked by Pega to the contrary -- about the FDA's eventual approval being a significant factor in defeating the plaintiffs theory that defendants "knew, by the first day of the Class Period, of the serious adverse side effects observed," Kovtun v. VIVUS, Inc., No. 10-4957, 2012 WL 4477647, at *10 (N.D. Cal. Sept. 27, 2012), aff'd sub nom., Ingram v. VIVUS, Inc., 591 F. App'x 592 (9th Cir. 2015) -- is

---

[2] The Court must "take as true all well-pleaded facts in the plaintiffs' complaint[ ] . . . and draw all reasonable inferences therefrom in [their] favor." Fothergill v. United States, 566 F.3d 248, 251 (1st Cir. 2009) (citing Muñiz-Rivera v. United States, 326 F.3d 8, 11 (1st Cir. 2003)).

distinguishable.  The Virginia Court of Appeal's decision,
unlike the FDA approval of a drug, is distinguishable.  While
some Virginia trial courts' errors warranted the reversal of the
verdict and a remand, the Court of Appeals also rejected Pega's
argument "that Appian failed to establish misappropriation of
any trade secret as a matter of law."  The Virginia Court of
Appeals also stopped short of ruling the trial court was in
error in refusing to strike the verdict, emphasizing that
"Appian provided considerable evidence that it took careful
steps to safeguard its secrets and that the information was
neither 'generally known' nor readily ascertainable."  See
Pegasystems, 904 S.E.2d at 284, 265.  Thus, the reversal of the
Virginia Action verdict has no bearing on the truth or falsity
of Pega's statements which gave rise to the PS Lit claims at
this stage of the proceedings.

The same analysis applies to Pega's statements that the
appropriate causation standard did not support Appian's claim--
the Defendants misconstrue the Virginia Court of Appeals
decision as reinforcing the correctness of this statement by
saying that the damages award "had 'no correlation to proximate
cause.'"  Defs.' Mem. at 10.  The statement in full (from the
Quarterly Report on Form 10-Q for the first quarter of 2022),
however, voiced Pega's belief "that any alleged damages claimed
by Appian are not supported by the necessary legal standard of

proximate cause." Compl. ¶ 162 (emphasis added). The Virginia

Court of Appeals merely held that the erroneous exclusion of

certain evidence in conjunction with a jury instruction's

emphasis on Pega's total sales "exponentially increased the

likelihood of a runaway damages verdict that had no correlation

to proximate cause." Pegasystems, 904 S.E.2d at 276.

For these reasons, Pega's arguments as to the Virginia

Court of Appeals decision's impact in this case fail.


### 2.    Code of Conduct

Next, Pega argues that Pega's Code of Conduct statement

expressing its commitment "[n]ever [to] use illegal or

questionable means to acquire a competitor's trade secrets or

other confidential information" is neither misleading nor

material. Compl. ¶ 16. Pega further contends that the Virginia

Court of Appeals' decision is "fatal" to PS Lit's attempt to

show objective and subjective falsity. Defs.' Mem. at 10. This

Court will proceed with the renewed analysis for the same reason

stated above.

While other courts have recognized codes of conduct as

"inherently aspirational" and "express[ing] opinions as to what

actions are preferable, as opposed to implying that all staff,

directors, and officers always adhere to its aspirations," this

view generally applies to objectively unverifiable statements.
Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v.
Hewlett-Packard Co., 845 F.3d 1268, 1276-77 (9th Cir. 2017)
(quoting Andropolis v. Red Robin Gourmet Burgers, Inc., 505 F.
Supp. 2d 662, 685-86 (D. Colo. 2007)); see also Singh v. Cigna
Corp., 918 F.3d 57, 61, 63 (2d Cir. 2019) (holding that code of
ethics statements regarding "a responsibility to act with
integrity in all we do, including any and all dealings with
government officials" were a "textbook example of 'puffery'").
As this Court has already ruled, however, Pega's Code of Conduct
statements that "describe[ ] with specificity a course of
conduct" that the defendant "promised to abjure" are not
aspirational and thus may be deemed actionable.  Fort
Lauderdale, 683 F. Supp. 3d at 134; see, e.g., Constr. Laborers
Pension Tr. v. CBS Corp., 433 F. Supp. 3d 515, 532 (S.D.N.Y.
2020) (listing among potentially actionable statements,
"statements that were so anathema to the alleged internal
wrongdoing that, even if general or aspirational, they were
materially false."); In re Tenaris S.A. Sec. Litig., 493 F.
Supp. 3d 143, 159 (E.D.N.Y. 2020) (finding actionable the code
of conduct statement that "[the company] will not condone, under
any circumstances, the offering or receiving of bribes or any
other form of improper payments").

[19]

Here, Pega argues that due to the Virginia Court of
Appeals' decision to vacate the lower state court's verdict,
this Court's ruling as to the actionability of one of the Pega's
Code of Conduct statements is no longer valid.  The Court,
again, rejects this argument.

Pega's Code of Conduct stated "that Pega would '[n]ever use
illegal or questionable means to acquire a competitor's trade
secrets or other confidential information, such as ... seeking
confidential information from a new employee who recently worked
for a competitor, or misrepresenting your identity in hopes of
obtaining confidential information.'"  Compl. ¶ 171 (emphasis
omitted).  As this Court observed in Fort Lauderdale, Pega's
Code of Conduct was an assurance "specifically directed to
investors."  683 F. Supp. 3d at 133 n.6.  Contrary to what Pega
asserts in its motion to dismiss, the assurance implicated not
only trade secrets, but also "other confidential information."
This assurance explicitly proscribed Pega from "us[ing] illegal
or questionable means to acquire" and "misrepresenting your
identity in hopes of obtaining" such information.  Meanwhile, PS
Lit alleged that several Pega employees and officers were either
actively participating or at least familiar with the ongoing
operation, and that some Pega officers had doubts regarding the
legality of these practices.  Compl. ¶ 175.  Furthermore, as PS
Lit highlights in its opposition, Pega did not appeal the

Virginia verdict as to the VCCA violations by Pega which, while only resulting in nominal damages, could still be considered bearing on to the falsity of the Code of Conduct assurances. Pl.'s Opp'n at 12 n.9. These allegations, seen in a light most receptive to the non-movant, are enough to survive a motion to dismiss.

### 3.   Litigation Risk Disclosures

PS Lit further alleges that Pega "misleadingly failed to disclose the Virginia Action, which commenced in May 2020, or Pega's egregious misappropriation of Appian's confidential information" in its SEC Reports on Form 10-Q, filed in the second and third quarter of 2020, throughout 2021, as well as Form 10-K filed in 2021. Compl. ¶¶ 153-60. These forms incorporated by reference the Form 10-K for fiscal year 2019 filed by Pega in February 2020 – three months before Appian filed their Virginia lawsuit. Id. ¶ 154. PS Lit's claim is that the representations made in these forms repeatedly informed investors about a potential <u>risk</u> for litigation, but, misleadingly, never actually disclosed that Pega "had <u>already</u> engaged in a scheme to misappropriate Appian's intellectual property, had <u>already</u> been caught in the act by Appian, was <u>already</u> mired in litigation over its scheme, and <u>already</u> faced enormous financial and reputational risk as a result." Id. ¶

153 (emphasis in original).  PS Lit argues that Pega's failure

to disclose the Virginia Action and potential loss exposure

constituted a violation of SEC (Item 103) and GAAP (ASC 450)

regulations.  Compl. ¶¶ 160(d), 179-213.  Forms 10-Q were signed

by Stillwell; Forms 10-K--by both Stillwell and Trefler.  Id. ¶¶

151, 155, and 157.

Pega argues that such explicit disclosure was not required

under Item 103 as material pending litigation, nor as a loss

contingency under GAAP principles (ASC 450), and it was

"necessarily included" by the passage, incorporated by reference

in the SEC filings before Feb. 16, 2022, that Pega "ha[s]

received, and may in the future receive, notices that claim we

have misappropriated, misused, or infringed other parties'

intellectual property rights, and to the extent we gain greater

market visibility, we face a higher risk of being the subject of

intellectual property infringement claims."  Defs.' Mem. at 11-

15; Compl. ¶ 153.

### a.    S.E.C. Regulation S-K, Item 103

As to Item 103, the regulation requires disclosure of "any

material pending legal proceedings, other than ordinary routine

litigation incidental to the business, to which the registrant

or any of its subsidiaries is a party or of which any of their

property is the subject."  17 C.F.R. § 229.103(a).  An exception

is provided for proceedings "[t]hat involve primarily a claim

for damages if the amount involved, exclusive of interest and costs, does not exceed 10 percent of the current assets of the registrant and its subsidiaries on a consolidated basis," in which case "no information need be given."  17 C.F.R. § 229.103(b)(2).

Here, Pega argues that: 1) Appian's $90,000,000 damages claim "amounted to just 5% of Pega's current assets in every quarter before February 2022 except for [...] 3Q 2021" thus falling within the Item's 103's exception, 2) the Virginia Action "was exactly the type of claim to which [it] [was] 'ordinarily' subject," and 3) that PS Lit "ha[s] not adequately alleged that [Pega] did not actually believe" that the Virginia Action was immaterial.  Defs' Mem. at 14-15 (quoting Salim v. Mobile Telesystems PJSC, No. 19-1589, 2021 WL 796088, at *9 (E.D.N.Y. Mar. 1, 2021), aff'd, No. 21-839-CV, 2022 WL 966903 (2d Cir. Mar. 31, 2022)).

This Court is not persuaded by Pega's arguments.  As held by the Supreme Court in Omnicare, "[t]he investor must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." 575 U.S. at 194.

[23]

PS Lit makes extensive allegations as to why the Virginia Action fell outside classification as an "ordinary routine litigation incidental to [Pega's] business." Compl. ¶¶ 184-204. PS Lit points out that Pega itself, in its 2021 10-K form filed on February 16, 2022, indicated several million dollars in legal fees and related expenses that arose "from proceedings that originated outside of the ordinary course of business", id. ¶¶ 186-88, and that the damages sought in Virginia Action by Appian surpassed the quantitative threshold of 10% required by Item 103.[3] Id. 190-93. Importantly, PS Lit makes these allegations in the broader context, arguing that the Virginia Action cannot be considered ordinary or routine and should have been disclosed no later than in Pega's 2Q20 10-Q filing. Id. ¶ 189. This is especially relevant considering the "extraordinary allegations" of conducting "a nearly decade-long scheme to misappropriate a primary competitor's information" as to the publicly traded company, its CEO, and senior management. Id.

Pega's argument that the disclosure mandated by Item 103 is "necessarily included" in the passage that "Pega "ha[s] received, and may in the future receive, notices that claim we

---

[3] PS Lit states that "Pega's reported then-current assets during Relevant Period ranged from approximately $804 million to $977 million," while Appian sought damages "in an amount that will exceed $90 million." Compl. ¶¶ 191-92 (emphasis in original) (internal citation omitted).

have misappropriated, misused, or infringed other parties'
intellectual property rights..." is also unavailing.  Defs.'
Mem. at 11; Compl. ¶ 153.  The situation here is clearly
distinguishable from In re SeaChange Int'l, Inc., No. 02-12116-
DPW, 2004 WL 240317, at *10 (D. Mass. Feb. 6, 2004) (Woodlock,
J.), where "[the] disclosure was certainly enough to alert
investors of the [pending] litigation and to prompt them to make
further inquiry directly about the litigation should they choose
to do so."  Here, Pega did not give the investors enough
information to conduct their inquiry.  While "[t]he disclosure
required by Item 103 is meant to put potential investors on
notice of pending litigation, not to force companies to predict
a particular outcome in the litigation," id. (citing Wielgos v.
Commonwealth Edison Co., 892 F.2d 509, 517-18 (7th Cir. 1989)),
a disclosure of unspecified "notices of claim" cannot be treated
as alerting the investing public in the same manner as outright
naming of a pending litigation.  To the contrary, considering
the Section 10(b) and Rule 10-5 requirements, such partial
information could arguably be seen as a "half-truth" -- the type
of omission these rules aim to prohibit.[4]  See Zhou, 120 F.4th at

_____

[4]  For this reason, Pega raised the argument that it "could
not have known the trial judge would misapply Virginia law in a
manner 'exponentially increas[ing] the likelihood of a runaway
damages verdict.' Defs.' Mem. at 15 (quoting Pegasystems, 904
S.E.2d 247 at 276).  This argument does not persuade the Court,
as the issue here does not turn on whether Pega was or was not

292 (quoting <u>Macquarie Infrastructure Corp.</u> v. <u>Moab Partners, L.</u>
<u>P.</u>, 144 S. Ct. 885, 891 (2024)).  For these reasons, PS Lit has
adequately pled its allegations as to the Item 103 disclosures
being misleading.

### b.  **GAAP Rule ASC 450**

With respect to the arguments as to whether Pega violated
GAAP Rule ASC 450, Compl. ¶¶ 205-213; Defs.' Mem. at 13-14, this
Court confirms its ruling expressed in <u>Fort Lauderdale</u> that
having found Pega and Trefler's statements false and/or
misleading, and "given the fact-intensive nature of that
question, this Court prefers not to express a definitive view on
the issue at this stage."  683 F. Supp. 3d at 136 n.10; <u>see</u>
<u>also</u>, <u>e.g.</u>, <u>In re Ambac Fin. Grp., Inc. Sec. Litig.</u>, 693 F.
Supp. 2d 241, 273 (S.D.N.Y. 2010) ("The parties' disagreements
over GAAP compliance also raise issues of fact that cannot be
resolved on a motion to dismiss.")

### 4.  **BPM Industry, Pega's Marketing Efforts, and "Competitiveness" Statements**

PS Lit makes allegations with respect to several statements
made by Pega and the Individual Defendants in a variety of

---

able accurately to predict the outcome of the Virginia Action
<u>per se</u>.

different circumstances which were related to sales, competitive efforts, and market positioning of Pega.[5]  Compl. ¶¶ 139-49.

PS Lit claims these statements were materially false and misleading when made, as they failed to disclose that the positive outcomes were owed to espionage on competition to gain access to its competitors' confidential information and trade secrets.[6]  Id. ¶ 150.  Additionally, PS Lit makes several allegations as to Stillwell, Compl. ¶¶ 214-17, that this Court has ruled insufficient.  See Elec. Clerk's Notes, ECF No. 40.

Pega challenges these allegations, stating that PS Lit "has not plausibly alleged that those statements were objectively false, or that Pega did not believe that it was competitively differentiated or that its commercial success was attributable to client relationships and industry experience."  Defs.' Mem. at 12.  As to any statements attributed to Stillwell, Compl. ¶¶ 139-40, 142-43, 145, 149, Pega invokes the Fort Lauderdale decision where these statements were ruled not actionable as

---

[5] NASDAQ 42nd London Investor Conference, 40th  Annual Canaccord Genuity Growth Conference, Barclays Global Technology, Media and Telecommunications Conference, conference call with investors and analysts as part of the Jeffries Software Conference, Pegasystems' second quarter of 2020 earnings call, Form 10-K for fiscal year 2020.

[6] These comments concerned Pega's "credib[ility]" with customers in public sector, Compl. ¶ 142-43, its ability to "differentiat[e]" and "show very well competitively", id. ¶¶ 139, 141, 144, 147, its solution being "best-in-class", id. ¶ 140, and its marketing and sales efforts, id. ¶¶ 148-49.

they were made without scienter.  Defs.' Mem. at 11-12 (citing
Fort Lauderdale, 683 F. Supp. 3d at 132).  Moreover, as to
Stillwell's statements with Presidium on March 11, 2020, May 5,
2020, and June 4, 2020, Pega challenges the allegations
contending these statements were puffery.  Defs.' Mem. at 12
n.21.

This Court rules that the argument over these allegations
is fact-intensive, making resolution at this stage
inappropriate.  Thus, this Court adopts the same approach as it
did with respect to GAAP Rule ASC 450 violations.  See supra at
26.


**C.   Scienter**

A statement, even if found false or misleading, must have
been made with the requisite scienter to be actionable under
PSLRA.  See ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46,
58 (1st Cir. 2008).  Importantly, in a private enforcement
action "the PSLRA also separately imposes a rigorous pleading
standard on allegations of scienter."  Id.  Specifically, the
pleaded facts must give rise to a "strong inference" of
scienter.  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551
U.S. 308, 322 (2007).  To support a finding of scienter under
the PSLRA, a complaint must "state with particularity facts
giving rise to a strong inference that the defendant ... either

... consciously intended to defraud, or that they acted with a high degree of recklessness." Quinones, 106 F. 4th at 182 (citation and internal quotation marks omitted). "It does not suffice that a reasonable factfinder plausibly could infer from the complaint's allegations the requisite state of mind." Tellabs, 551 U.S. at 314. Instead, "an inference of scienter must be more than merely plausible or reasonable -- it must be cogent and at least as compelling as any other opposing inference of nonfraudulent intent." Id.

> Recklessness in this context means "a highly unreasonable omission, involving not merely simple, or even inexcusable[] negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it."

In re Biogen Inc. Sec. Litig., 193 F. Supp. 3d 5, 44 (D. Mass. 2016) (Saylor, J.) (quoting Mississippi Pub. Emps.' Ret. Sys. v. Boston Sci. Corp. II, 649 F.3d 5, 20 (1st Cir. 2011)) (alteration in original), aff'd, 857 F.3d 34 (1st Cir. 2017).

As this Court previously wrote about the applicable PSLRA standard, these "heightened pleading requirements" go beyond the standard provided in Rule 9(b). Securities & Exch. Comm'n v. Sharp, 626 F. Supp. 3d 345, 388 (D. Mass. 2022) (quoting Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, 547 U.S. 71, 81 (2006)). Judge Lindsay aptly described the underlying reasoning of this important legislative intervention:

> In particular, Congress sought to reform private
> securities litigation to discourage unmeritorious class
> actions, including actions brought because of a decline
> in stock prices. The aims of the PSLRA are three-fold:
> '(1) to encourage the voluntary disclosure of
> information by corporate issuers; (2) to empower
> investors so that they--not their lawyers--exercise
> primary control over private securities litigation; and
> (3) to encourage plaintiffs' lawyers to pursue valid
> claims and defendants to fight abusive claims.' The
> PSLRA seeks to curtail the filing of abusive lawsuits at
> the pleading stage of litigation by establishing uniform
> and stringent pleading requirements.

In re Galileo Corp. S'holders Litig., 127 F. Supp. 2d 251, 260

(D. Mass. 2001) (citations and quotations omitted).

With that in mind, this Court evaluates the scienter

allegations made by PS Lit, which were in many instances

repackaged and expanded, as compared to the allegations made by

the class action plaintiffs in Fort Lauderdale.  PS Lit makes

these extensive scienter allegations as to Pega, its officers --

including the Individual Defendants -- and its employees. In

particular, PS Lit highlights how Pega secretly engaged a third

party "to identify and recruit 'an Appian Developer' who was not

'loyal' to Appian." Compl. ¶¶ 65-76.  PS Lit also highlights

Zou's work creating various materials based on his access to

Appian's software was essential for "Project Crush", the

concealment of his identity, even in the internal conversations,

Zou's close work with Pega employees.  Compl. ¶¶ 65-76, 219-220.

PS Lit further alleges that "various Pega employees used fake

names and fake or front companies to conceal evidence of their

espionage" when accessing Appian's platform, e.g., the free
trial of Appian's software, in full knowledge and approval of
several Pega's officers. Id. ¶¶ 92-109, 224. In this context,
one of the directors -- Ben Baril ("Baril") -- allegedly changed
his deposition testimony in the Virginia Action, as to the
reason why he has created a fake consulting firm with a
fictitious website. Baril changed his reasoning from
"subscrib[ing] to certain journals or things that wanted
personal information that I didn't want to share", to
"obtain[ing] access to a free Appian trial." Baril also
allegedly changed his awareness of "anyone at
Pegasystems...taking action to get access to the Appian software
platform," from "I'm not" to "[y]es, I'm aware of someone - of
others taking action to get access to the Appian software
platform." Id. ¶¶ 226-230. What can be inferred from these
allegations is Pega's awareness and organized effort: 1) to
obtain information (presumably business confidential, if not
rising to the level of trade secrets) by employing methods that
violate Pega's own Code of Conduct, and 2) to conceal these
dubious corporate intelligence practices from the investing
public.[7]

---

[7] The complaint alleges, based on depositions and trial
transcripts from the Virginia Action that Pega's officers and
employees had voiced their doubts regarding the legality of
these practices. Compl. ¶¶ 238-42.

Standing alone, the abovementioned practices may create at least an equally strong inference that the purpose of keeping secrets was to prevent Appian from learning about Pega's theoretically legal corporate intelligence efforts. "When there are equally strong inferences for and against scienter," however, "the draw is awarded to the plaintiff." Pizzuto v. Homology Meds., Inc., No. 1:23-CV-10858-AK, 2024 WL 1436025, at *15 (D. Mass. Mar. 31, 2024) (Kelley, J.) (quoting City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp., 632 F.3d 751, 757 (1st Cir. 2011)); see also Skiadas v. Acer Therapeutics Inc., No. 1:19-CV-6137-GHW, 2020 WL 3268495, at *10 (S.D.N.Y. June 16, 2020) (Woods, J.) ("At the motion to dismiss stage, a tie on scienter goes to the plaintiff").

Moreover, what pushes these inferences beyond the required threshold are the allegations as to Pega's senior management. Most notable is Trefler -- both as an Individual Defendant and a corporate officer responsible for making the challenged statements whose scienter is imputed to Pega, see In re Boston Sci. Corp. Sec. Litig., No. CV 20-12225-DPW, 2022 WL 17823837, at *2 (D. Mass. Dec. 20, 2022) (Woodlock, J.) -- and who is personally alleged to have instigated and overseen the fraudulent scheme. Compl. ¶¶ 66, 77. Importantly, the complaint paints Trefler not only as an overseer, who allegedly approved hiring the inside operative, id. ¶ 66, received updates

about the intelligence operations, e.g., id. ¶¶ 10, 67, 85, 86, 88, 96, 252, but also as an active participant, who himself used a fake alias to access Appian software, id. ¶ 224.

In its defense, Pega argues that the Virginia Action demonstrates a lack of the required scienter, pointing to "Trefler's belief that Pega's competitive intelligence efforts were lawful and that Appian's claims were without merit because Pega had not misappropriated any 'trade secrets.'" Defs.' Mem. at 16-17. Pega reasons that "even if [the Court] were to accept as true Plaintiffs' unsupported statements that ... [Trefler] ... must have known both about the [lawsuit] and about the fraudulent business practices forming the basis of [the Virginia Action], the important issue in this case is not whether Defendants knew the underlying facts, but whether Defendants knew that not disclosing the [lawsuit] posed substantial likelihood of misleading a reasonable investor." Id. at 17 (quoting City of Philadelphia v. Fleming Cos., Inc., 264 F.3d 1245, 1264 (10th Cir. 2001)).

These arguments are unavailing. First, the PS Lit allegations in this case are supported and substantiated by the extensive evidentiary material of the Virginia Action invoked and cited by PS Lit in its complaint. Even if this Court does not rely on this material, the existence of that evidence serves as a basis for alleging facts here. Second, Trefler personally

signed and authorized the statements that PS Lit alleges were
false and misleading.  Considering Trefler's knowledge about
both the underlying facts pertaining to the corporate
intelligence efforts and the effect that relief sought by Appian
may have on Pega's financial situation, an outright "denial of
Appian claims' merit posed an obvious danger to mislead
investors as to the substantial risks Pega was facing in
connection with the Virginia Action." Fort Lauderdale, 683 F.
Supp. 3d at 132; see also Schlifke v. Seafirst Corp., 866 F.2d
935, 946 (7th Cir. 1989) ("rather, it is the 'danger of
misleading buyers [that] must be actually known or so obvious
that any reasonable man would be legally bound as knowing'")
(quoting Sundstrand Corp. v. Sun Chem. Corp., 553 F.2d 1033,
1045 (7th Cir. 1977)).

Taken together, these factors create a cogent and
compelling inference of, if not conscious intention to defraud,
at least a high degree of recklessness.  See Quinones, 106 F.4th
at 182.  As this Court previously noted, "[s]cienter is a
holistic concept and 'need not be irrefutable, i.e., of the
"smoking-gun" genre, or even the "most plausible of competing
inferences."'" Premca Extra Income Fund LP, 763 F. Supp. 3d at
158 (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551
U.S. 308, 323-324(2007).  Accordingly, this Court rules that PS

Lit has alleged sufficient facts to raise a strong inference of scienter as to Pega and defendant Trefler.

With respect to defendant Stillwell, this Court signaled during the motion hearing that the scienter allegations are insufficient. Tr. Mot. Hr'g at 20. Admittedly, PS Lit has attempted to bolster its argument by invoking defendant Stillwell's statements made after the Virginia Action trial. Compl. ¶ 129. PS Lit reasons that "Defendants now concede that the preparers and signers of Pega's financial disclosures -- including Stillwell -- determined that the Virginia Action was 'immaterial, ordinary, and routine litigation' that did not require disclosure" and that "[s]uch a determination requires an actual assessment of the merits." Pl.'s Opp'n at 14. Because of this assessment, "it cannot be 'mere speculation' that Stillwell investigated and evaluated the Virginia Action in the course of making determinations of its merit and materiality: that is a conceded fact (or there is at least a strong inference of that fact based on Defendants' argument)." Id. To no avail. PS Lit still relies on the inference that Stillwell must have assessed, investigated, and evaluated the merits of the Virginia Action because of his position in Pega -- a repackaged "must have known" claim. Thus, this Court's conclusions made in Fort Lauderdale, finding such allegations a "mere speculation" and "a mere extension of the 'scienter by status' theory, which has

been uniformly rejected," retain their validity in this case.

Fort Lauderdale, 683 F. Supp. 3d at 132 (quoting Lirette v.

Shiva Corp., 27 F. Supp. 2d 268, 283 (D. Mass. 1998)).

### D. Section 20(a) Against Individual Defendants is Plausibly Alleged

Section 20(a) provides that once a company has been found

to have violated the Exchange Act's substantive provisions,

"[e]very person who, directly or indirectly, controls" the

company "shall also be liable jointly and severally with and to

the same extent as [the company] . . . unless the controlling

person acted in good faith and did not directly or indirectly

induce the act or acts constituting the violation or cause of

action." 15 U.S.C. § 78t(a) (emphasis added). Thus, "[a]

Section 20(a) claim," 15 U.S.C. § 78t, "is derivative of an

underlying violation of the securities laws." Fire & Police

Pension Ass'n of Colorado v. Abiomed, Inc., 778 F.3d 228, 246

(1st Cir. 2015) (citing ACA Fin. Guar. Corp. v. Advest, Inc.,

512 F.3d 46, 67-68 (1st Cir. 2008)). Accordingly, to plead a

viable Section 20(a) claim against the Individual Defendants,

the Plaintiffs must first plead an actionable claim under

Section 10(b) of the Exchange Act and Rule 10b-5. See In re

Stone & Webster, Inc., Sec. Litig., 424 F.3d 24, 27 (1st Cir.

2005) ("In short, it is an essential element of the § 20(a)

controlling person claims in question that plaintiffs show a Rule 10b-5 violation by the controlled entity."); _Winters_ v. _Stemberg_, 529 F. Supp. 2d 237, 247 (D. Mass. 2008) ("A section 20(a) claim is dependent on establishing an 'independent violation of the securities laws.'") (quoting _In re Focus Enhancements, Inc. Sec. Litig._, 309 F. Supp. 2d 134, 157 (D. Mass. 2001) (Woodlock, J.)).

Here, PS Lit alleges Section 20(a) claims against the Individual Defendants as controlling persons within the meaning of Section 20(a) on the grounds that:

> [b]y virtue of their high-level positions, participation in and awareness of the Company's operations, intimate knowledge of Pega's publicly-issued statements, and facts alleged . . . the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the allegedly false and misleading statements giving rise to the securities violations as alleged in [c]ount I.

Compl. ¶ 316. As to Trefler, PS Lit points to his position as the CEO and Chairman of Pega since 1983, who also owned, in the relevant time frame, 49-50% of Pega's outstanding common shares, and who, allegedly, "exerted a tremendous amount of power over the Company." _Id._ ¶¶ 310-11. With respect to Stillwell, PS Lit emphasizes his "expansive role at Pega on both the financial and operational side of the business" as the Company's COO and CFO. _Id._ ¶ 314. PS Lit further alleges that

> [t]he Individual Defendants . . . signed SEC filings
> during the Relevant Period, including SOX Certifications
> in connection with these filings attesting to their
> accuracy, and thus were responsible for the content and
> dissemination of these materials, including the false
> and misleading statements therein. . . . the Individual
> Defendants themselves made numerous false and misleading
> statements during industry or earnings conference calls
> identified above, and thus had the ability to prevent
> these statements from being made or cause the statements
> to be corrected.

Id. ¶ 315.

Pega makes one argument against control liability - that the claim must fail "because Plaintiff has failed to plead a violation of § 10(b)." Defs.' Mem. at 20 n.33.

As this Court stated above, however, the 10b-5 claim is adequately alleged. Since Section 20(a) imposes joint and several liability on "every person who, directly or indirectly, controls" the company, therefore, Trefler (as CEO of Pega) and Stillwell (as CFO of Pega) may be jointly and severally liable as control persons of Pega unless they "acted in good faith" and did not directly or indirectly induce the 10b-5 violation. 15 U.S.C. § 78t(a). As to both Trefler and Stillwell, control is alleged through their roles as senior executives of Pega, or at least through their signing of the relevant corporate disclosures (10-K and 10-Q). Stillwell, as COO and CFO, is implicated in the claim -- even though he may not have personally made the statement which gave rise to the 10b-5 claim.

[38]

Pega, however, does not offer an alternative argument in support of dismissing the section 20(a) claim -- it does not argue that Trefler or Stillwell acted in good faith, and did not directly or indirectly induce the 10b-5 violation.

Thus, PS Lit has adequately pleaded a claim under Section 20(a) as to both Trefler and Stilwell.

**E.    Loss Causation**

As it did in Fort Lauderdale, this Court sees the loss causation -- i.e., a "causal connection between the [] material misrepresentations" and the loss as adequately alleged by PS Lit. Massachusetts Ret. Sys. v. CVS Caremark Corp., 716 F.3d 229, 237 (1st Cir. 2013).

Pega allegedly concealed from the market its corporate espionage against Appian, while falsely reassuring investors that it would never misappropriate trade secrets. Compl. ¶ 154. After Appian sued and the existence of the Virginia Action was disclosed, Pega continued misleading investors stating that the claims against it were "without merit." Id. ¶ 263. As the reality of the Virginia Action trial began "leak[ing] into the marketplace," Pega's stock price started sinking, falling dramatically following the multi-billion-dollar judgment. Id. ¶ 263-66. The allegations go beyond a correlation, and into the causation territory. Contrary to the Pega's arguments, Defs.'

[39]

Mem. at 18-19, PS Lit mentions and quotes several analysts commenting on the negative impact that the verdict and the subsequent judgement may have (had) on Pega's stock price, tying that drop in stock to the verdict and Pega's misappropriation of trade secrets. Compl. ¶¶ 267-68, 271. Moreover, PS Lit alleges that

> The timing and magnitude of the decline in the price of Pega's stock, particularly when compared to the movements of the NASDAQ stock index and the S&P Software Index . . . negate any inference that the loss suffered by Plaintiff was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

Id. ¶ 272. Taken as true, it is thus apparent that Pega's disclosure of the verdict "relate[s] to the same subject matter as the alleged misrepresentation[s]." Massachusetts Ret. Sys., 716 F.3d at 240. Accordingly, PS Lit has sufficiently alleged loss causation at this stage.

### F. Common Law Fraud Claim (Count IV)

PS Lit also brings, and Pega challenges, a claim for common law fraud, premised on substantially the same allegations of false or misleading statements and omissions as the federal securities fraud claim. Compl. ¶¶ 319-325.; Pl.'s Opp'n at 20.

Claims of fraud under Massachusetts law require a showing of essentially the same elements as Rule 10b-5--to recover for

fraud, a plaintiff must prove[8] that the defendant: "(1) 'made a
false representation of material fact'; (2) 'with knowledge of
its falsity'; (3) 'for the purpose of inducing the plaintiff[ ]
to act on this representation'; (4) 'that the plaintiff[ ]
reasonably relied on the representation as true'; and (5) 'that
[the plaintiff] acted upon it to their damage.'"  AcBel
Polytech, Inc. v. Fairchild Semiconductor Int'l, Inc., 928 F.3d
110, 122 (1st Cir. 2019) (citing Cumis Ins. Soc'y, Inc. v. BJ's
Wholesale Club, Inc., 455 Mass. 458, 470 (2009)).  "A false
representation can occur through omission, or 'the failure to
disclose a material fact.'"  Walgreen Co. v. Haseotes, 778 F.
Supp. 3d 264, 285 (D. Mass. 2025) (Guzman, J.) (quoting Van v.
American Airlines, Inc., 370 F. Supp. 3d 218, 232 (D. Mass.
2019)).  "[T]o establish a fraud by omission claim, a plaintiff
must establish defendants' 'concealment of material information'
and 'duty requiring disclosure.'"  AcBel Polytech, Inc, 928 F.3d
at 122 (quoting Sahin v. Sahin, 435 Mass. 396, 403 n.9 (2001)).

PS Lit raises essentially the same allegations as to both
the federal securities fraud and common law fraud claims.  Since
"[t]he elements of common law fraud are substantively similar to
those of securities fraud under Rule 10b-5," In re Lernout &

---

[8] By a preponderance of the evidence.  See Compagnie De
Reassurance D'Ile De France v. New England Reinsurance Corp., 57
F.3d 56, 72 (1st Cir. 1995).

Hauspie Sec. Litig., 230 F. Supp. 2d 152, 176 (D. Mass. 2002)
(Saris, J.) (citations omitted), the forgoing analysis would
mirror the discussion above.[9]  As this Court rules the PS Lit
allegations as to material misrepresentations by Pega and
Trefler and strong inference of scienter are adequately pleaded,
the same conclusion ought be reached here.  Since the PSLRA
pleading standard is met, this relatively less stringent
standard is also met.  Accordingly, Pega's motion to dismiss the
common law fraud claim (count IV) is **DENIED**.


### G.    Negligent Misrepresentation Claim

Pega further challenges PS Lit's allegations of negligent
misrepresentation as to all Defendants.

"The standard for a negligent representation claim . . .
differs . . ." from the fraud standard in that it ". . . does
not require an intent to deceive or actual knowledge that a
statement is false." AcBel Polytech, Inc., 928 F.3d at 122
(quoting Cumis Ins. Soc'y, 455 Mass. at 471).  "To sustain a
claim for negligent misrepresentation under Massachusetts law,"
however, "a plaintiff must show that the defendant: (1) in the
course of its business, (2) supplied false information for the

---

[9] See also Kennedy v. Josephthal & Co., 635 F.Supp. 399, 401
(D. Mass. 1985) (Mazzone, J.) (noting that elements of common
law fraud are essentially the same as those of 10b-5 fraud)
(citation omitted).

guidance of others (3) in their business transactions, (4) causing and resulting in pecuniary loss to those others (5) by their justifiable reliance upon the information, and (6) that it failed to exercise reasonable care or competence in obtaining or communicating the information." Optim LLC v. Freeman Mfg. LLC, 774 F. Supp. 3d 274, 288 (D. Mass. 2025) (Guzman, J.) (quoting Cummings v. HPG Int'l, Inc., 244 F.3d 16, 24 (1st Cir. 2001)) (citations omitted). "Negligent misrepresentation claims" are also still "subject to Rule 9(b) 'where the core allegations effectively charge fraud.'" In re LastPass Data Sec. Incident Litig., 742 F. Supp. 3d 109, 125 (D. Mass. 2024) (Saris, J.) (quoting North Am. Cath. Educ. Programming Found., Inc. v. Cardinale, 567 F.3d 8, 15 (1st Cir. 2009)).

Pega argues this claim fails because the "Plaintiff does not plausibly allege a materially false statement . . . or that Defendants did not exercise 'reasonable care or competence in ... communicating the information' conveyed." Defs.' Mem. at 20.

As this Court has already ruled, however, several Pega and Individual Defendants' statements are plausibly alleged to have been false at the time they were communicated. Unlike a claim for fraud or a 10b-5 violation, a negligent misrepresentation claim does not require intentional wrongdoing or scienter, which makes defendant Stillwell's lack of scienter immaterial. PS Lit

adequately alleges Pega and the Individual Defendant's failure
to exercise reasonable care in providing information.  Compl. ¶¶
328-32.  PS Lit also makes extensive and adequate allegations as
to the reliance on the false information (by Pega's SEC filings,
impressions of the Defendants' statements, and reliance on these
inputs when creating a valuation model of Pega and purchasing
its stock).  Compl. ¶¶ 277-81.

Thus, PS Lit did plausibly allege a materially false
statement and that Pega and the Individual Defendants breached
their duty of care in communicating critical information to
investors.  Therefore, the motion to dismiss the negligent
representation claim (count V) is **DENIED.**

## V.    CONCLUSION

For the reasons stated above, Pega's and Individual
Defendants' motion to dismiss this action, ECF No. 26, is hereby
**ALLOWED** in part and **DENIED** in part.

In sum, the motion is **ALLOWED** as to count II (10b5(a) and
(c) scheme), and with respect to defendant Stillwell, as to
count I (violation of Section 10(b) and Rule 10b-5) and count IV
(Common Law Fraud).  The motion is **DENIED** as to the improper
assignment, counts I and IV (with respect to the defendants Pega
and Trefler), count III (the Section 20(a) claim), and count V

(negligent misrepresentation as to all Defendants).

**SO ORDERED.**

                                    _William G. Young_
                                    WILLIAM G. YOUNG
                                         JUDGE
                                        of the
                                    UNITED STATES[10]

---

[10] This is how my predecessor, Peleg Sprague (D. Mass. 1841-1865), would sign official documents.  Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 47 years.